ESTATE OF MICHAEL SAWCZAK, DECEASED, TONI A. SAWCZAK, PERSONAL REPRESENTATIVE, AND ANTOINETTE SAWCZAK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sawczak v. Commissioner
Docket No. 14580-89
United States Tax Court
T.C. Memo 1993-210; 1993 Tax Ct. Memo LEXIS 214; 65 T.C.M. (CCH) 2641; May 17, 1993, Filed; As Corrected May 18, 1993 *214 Ps operated two laundromats during the years at issue. R determined deficiencies based upon Ps' secret records, which indicated unreported income from the laundromats. Income from only one of the laundromats (the laundromat) remains at issue. Ps owned the laundromat through their partnership. The laundromat's business came from coin-operated washers and dryers, dropoff laundry, and game machines. Ps' secret records were inconsistent, and indicated two slightly different amounts of unreported income from the laundromat in 1985; R's determination for 1985 is based upon the higher amount. H and W each had substantial responsibilities in connection with operating the laundromat. W took particular responsibility for managing the dropoff business; she maintained a daily log of such business beginning no later than July 6, 1984. H maintained the secret records during each year at issue. W helped H maintain such records beginning in 1985. During each year at issue, W occasionally would deposit the laundromat's receipts into a partnership bank account and would verify that the teller posted the correct amount to that account. Held: Ps have failed to disprove the unreported *215 income indicated by their secret records, and R's determination therefore is sustained as to each year at issue. Held, further, with respect to the two different amounts of unreported income in 1985 indicated by Ps' secret records, each is equally credible; accordingly, although we accept the higher amount for deficiency purposes, we accept the lower amount for purposes of fraud. Franklin v. Commissioner, T.C. Memo. 1993-184; Rule 142(a) and (b), Tax Court Rules of Practice and Procedure.Held, further, R has proved H's fraudulent intent for each year at issue. Accordingly, H is liable for the additions to tax for fraud, under sec. 6653(b)(1) and ( 2), I.R.C., for each such year. (the latter addition to tax, as to 1985, sustained only as to the amount of unreported income proven by R.) Held, further, R has proved W's fraudulent intent only as to 1985. Accordingly, W is liable for the additions to tax for fraud, under sec. 6653(b)(1) and ( 2), I.R.C., with respect only to that year. (the latter addition to tax, as to 1985, sustained only as to the amount of unreported income proven by R.) Held, further, W is not an innocent spouse, under sec. 6013(e), I.R.C., as to 1983, 1984, or 1985. Notwithstanding that R has proved W's fraudulent intent only as to 1985, W has failed to prove she lacked knowledge of the understatements of income *216 for 1983 or 1984. Rule 142(a) and (b), Tax Court Rules of Practice and Procedure.
For petitioners: Glen A. Stankee. For respondent: W. Robert Abramitis and Julius Gonzalez. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency dated March 23, 1989, respondent determined deficiencies in petitioners' Federal income tax for the 1983, 1984, and 1985 taxable years, together with additions to tax for fraud under section 6653(b)(1) and (2), as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
1983
$ 8,776.40
$ 4,388.20
[1]
1984
24,684.19
12,342.10
[1]
1985
29,503.70
14,751.85
[1]
Respondent's determinations are based entirely upon unreported gross receipts from two laundromats owned and managed by petitioners during the years at issue. The issues for our consideration are: (1) Whether petitioners had unreported income as determined by respondent; (2) whether petitioners *217 are liable for the additions to tax for fraud under section 6653(b)(1) and (2); (3) whether petitioner Antoinette Sawczak is relieved of liability as an innocent spouse, pursuant to section 6013(e); and (4) whether the period of limitations imposed by section 6501 bars the assessment and collection of the deficiencies determined by respondent. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. By this reference, the stipulations of facts filed by the parties and the attached exhibits are incorporated herein. At the time the petition in this case was filed, petitioners resided in Lake Worth, Florida. From the 1940's until Michael Sawczak's death in January 1989, Michael Sawczak and Antoinette Sawczak were married. Neither Michael nor Antoinette Sawczak completed high school. For each year at issue, the Sawczaks filed joint U.S. Individual Income Tax Returns. 1. Laundromats
During the years at issue, petitioners operated two laundromats, Sawczak Laundromat *218 and Royal Palm Laundromat, through the following two entities, respectively: Jog Road Partnership (the partnership) and Sigma International, Inc. (Sigma). [1] The partnership was located in Lake Worth, Florida, and was operated by Michael and Antoinette Sawczak, d.b.a. Sawczak Laundromat. Each of the Sawczaks was a general partner and held a 50-percent interest in the partnership, during the years at issue. Sigma was a subchapter S corporation. During the years at issue, Michael Sawczak and his wife were the sole shareholders of Sigma. 2. Operation of the Jog Road Laundromat
The Jog Road laundromat's business came from customers (1) using its coin-operated washers and dryers, (2) dropping off their laundry to be washed and dried (dropoff laundry or dropoffs), and (3) playing game machines located on the premises. Each of the Sawczaks had specific *219 responsibilities with regard to the operation of the Jog Road laundromat. Michael Sawczak's responsibilities included maintenance of the various washers and dryers. In addition, he collected the cash from the laundromat's machines every night; Antoinette Sawczak occasionally helped out with the collection. At home, Michael Sawczak counted the day's receipts, which he then placed in a safe. Antoinette Sawczak was responsible for hiring and training employees. Every week, she handled the payroll, including the calculation of withholding and FICA taxes. She also cleaned the laundromat once a week and, during particularly busy times, helped out at the laundromat. Antoinette Sawczak took particular responsibility for managing the dropoff business and assuring its success. Beginning no later than July 6, 1984, Antoinette Sawczak maintained a daily log of the dropoff business, wherein for each customer she kept track of the amount received and the amount paid into the laundry machines to wash and dry that customer's laundry. When the daily log suggested that the dropoff business was performing below expectations, Antoinette Sawczak was responsible for looking into the matter, which *220 included making sure the employees were performing their work properly. For 1985, the partnership had gross receipts of roughly $ 48,250 from dropoffs. Its employees inserted into the machines a total of $ 17,500 to clean that laundry, netting a total of $ 30,750. For the years at issue, the Jog Road laundromat had an account at Suburban Bank in Lake Worth, Florida, over which both Michael and Antoinette Sawczak had signatory authority. At home, Michael Sawczak, on a weekly basis, prepared a deposit slip and inserted the slip and the gross receipts into a duffel bag, which either he or Antoinette Sawczak took to Suburban Bank to deposit. On those occasions when Antoinette Sawczak was the one to make the deposit, she would verify that the teller was posting the correct amount to the partnership's account. 3. Preparation of Tax Returns
Jaclyn Tedamonson, of the accounting firm of Tedamonson, Rowe, and Perry (the firm), was the accountant for the Sawczaks, the partnership, and Sigma. Tedamonson prepared all of the tax returns here at issue. The partnership, which was on the cash method of accounting, filed U.S. Partnership Returns of Income for each year at issue. Michael *221 Sawczak signed all of the partnership returns; Antoinette Sawczak signed only the 1984 partnership return. Petitioners filed joint U.S. Individual Income Tax Returns for the years at issue. Both Sawczaks signed all of those returns. The partnership returns indicated gross receipts of $ 105,154, $ 103,589, and $ 111,852, for 1983, 1984, and 1985, respectively. The Sawczaks' joint returns for those years were based upon those same figures. Michael Sawczak provided the firm with bank records for the partnership. [2] Tedamonson based her preparation of all the partnership returns for the years at issue on only those bank records. Tedamonson never audited the books and records of the partnership for the years at issue. After preparing the Sawczaks' individual tax returns, the firm mailed those returns to the Sawczaks for review. *222 The same practice was followed by the firm after preparing the returns for the partnership. In both cases, the returns were accompanied by a cover letter stating that such returns were prepared without verifying information submitted to the firm. The cover letters instructed the Sawczaks to review the returns for completeness and accuracy and to notify the firm of any questions. Tedamonson does not recall Michael Sawczak's ever notifying the firm that any of the tax returns were incomplete or inaccurate. Michael Sawczak never communicated to the firm that the partnership had greater gross income than reported on the returns. 4. Secret Records
Unbeknownst to Tedamonson, who prepared the Sawczaks' individual returns and the partnership returns, the Sawczaks secretly maintained records indicating receipts in excess of those indicated by the bank records provided to the firm. With respect to each year at issue, Michael Sawczak maintained a graph of weekly gross receipts, indicating gross receipts in excess of those disclosed to the firm or reported on the Sawczaks' returns. Those graphs reflect gross receipts of the partnership in the amounts of $ 132,900, $ 154,938, and *223 $ 157,369 for 1983, 1984, and 1985, respectively. In addition, for 1985 (but not 1983 or 1984), the Sawczaks maintained monthly calendar sheets, indicating gross receipts in excess of those disclosed to the firm or reported on the Sawczaks' returns. During 1985, after Michael Sawczak calculated each day's gross receipts, one of the Sawczaks recorded that figure on a monthly calendar sheet. The figures written by Antoinette Sawczak on the monthly calendar sheet ranged from $ 137 to $ 733. On each calendar sheet, Michael Sawczak calculated total gross receipts for the week and month. On the back of each such calendar sheet, Michael Sawczak added that month's total to the total gross receipts from the preceding months, thereby maintaining a running total of gross receipts for the year. On the December 1985 sheet, Michael Sawczak recorded yearly gross receipts for the partnership in the amount of $ 156,265.92, which figure very closely approximates the $ 157,369 figure shown by the Sawczaks' graph and determined by respondent for that year. The Sawczaks withheld both the graphs and the 1985 monthly calendar sheets from the firm. Michael Sawczak also maintained monthly calendar *224 sheets for the partnership between January and at least November 1986. On the back of the November 1986 calendar sheet, Michael Sawczak recorded the year's running total of gross receipts as $ 148,911.74. On a separate sheet of paper, Michael Sawczak added $ 148,911 together with certain other figures, arriving at a total of $ 164,026.74. Sometime between January and August of 1987, Michael Sawczak gave that sheet of paper to Jaclyn Tedamonson and represented the $ 164,026.74 as the partnership's gross receipts for 1986. Tedamonson wrote "Total Gross Receipts per Michael Sawczak" on that sheet and used the $ 164,026.74 figure in preparing the partnership returns for 1986. 5. Efforts To Sell the Laundromats
In 1986, Michael Sawczak began marketing the two laundromats. In 1986, Michael Sawczak met with Mr. and Mrs. Lynwood Johnson, who were interested in purchasing the Jog Road laundromat. Mr. Sawczak represented to the Johnsons that, although he had reported about $ 23,000, they could make $ 50,000 a year on the Jog Road laundromat. He provided some figures for the purchase price and stated that a portion of the purchase price would have to be paid "under the table", *225 for tax-avoidance purposes. Antoinette Sawczak did not attend that meeting. Also during 1986, Michael Sawczak contacted John Ovaska (Ovaska), a broker of laundromats, representing that the Jog Road laundromat was producing gross receipts of approximately $ 180,000. Ovaska then gathered some information on the partnership and prepared an estimate of the partnership's gross receipts. Based on the water consumption from July 1985 through June 1986, Ovaska estimated the partnership's annual gross receipts at $ 172,000. Ovaska then introduced Michael Sawczak to Arnold Cady (Cady), who earlier had bought a laundromat through Ovaska and was interested in purchasing another. Ovaska informed Cady that the Sawczaks had two laundromats for sale. Michael Sawczak then had several telephone conversation and two meetings with Cady. During these discussions, Michael Sawczak told Cady that he wanted $ 390,000 for both laundromats, $ 100,000 of which was to be paid under the table for tax-avoidance purposes. Michael Sawczak informed Cady that he collected money from the machines, deposited just enough in the bank to cover expenses, and put the rest in his pocket and that only the deposits *226 were reported. The last meeting between Cady and the Sawczaks was held at the Sawczaks' home in December 1986 and was attended by both Michael and Antoinette Sawczak. Cady wanted to verify the laundromats' income figures. He had already been provided with some numbers by Michael Sawczak, which he considered to be substantially consistent with his own and Ovaska's calculations (based upon water consumption). During that meeting, both Michael and Antoinette Sawczak explained how they operated the laundromats and how they kept their financial records. Antoinette Sawczak brought out graphs and explained to Cady that the figures for each week's gross receipts were plotted on the graph. One of the Sawczaks described the graph to Cady as representing the actual gross receipts of the laundromats. Antoinette Sawczak showed and explained the laundromats' dropoff records, which she had maintained. Finally, she showed and explained the monthly calendar sheets. 6. Undercover Operation
During the negotiations with the Sawczaks, Cady had been advised by his accountant to contact respondent. Cady contacted respondent and subsequently arranged for a meeting on December 22, 1986, between *227 the Sawczaks and one of respondent's special agents, who posed as a potential buyer of the laundromats. This meeting was recorded on tape and was held at the home of the Sawczaks, both of whom were present. Antoinette Sawczak participated in portions of that meeting. At that meeting, Michael Sawczak provided the agent with the terms of the proposed sale of the laundromats. He informed the agent that $ 100,000 of the total purchase price for the two laundromats would be paid under the table, for tax-avoidance purposes. He represented to the agent that the Jog Road laundromat's total income for 1985 was $ 156,000. He also showed and explained the graph and the 1985 monthly calendar sheets he had prepared for the partnership. Antoinette Sawczak explained the dropoff records to the agent. On December 22, 1986, agents of respondent's Criminal Investigation Division executed a search warrant at the Sawczaks' home. During that search, the agents seized the 1985 monthly calendar sheets, graphs, various cash register tapes, and several sheets of handwritten notes and calculations. On one of the cash register tapes, which is undated, Michael Sawczak handwrote "Jog" and "Gross $ 156,265.92". *228 A second cash register tape, on which Michael Sawczak also handwrote "Jog", lists 52 figures and then a total of $ 110,366.66. [3] On the back of the tape, Michael Sawczak subtracted by hand $ 111,852.44 from $ 156,265.92 for a net of $ 44,413.48. [4] Finally, on a sheet of handwritten notes in Michael Sawczak's handwriting, Michael Sawczak subtracted $ 90,000 (next to which he wrote "expense") from $ 156,000 to reach a net figure of $ 66,000. At the top of that sheet, Michael Sawczak wrote "Jog RD". On another sheet, he wrote "Jog" and listed 12 monthly figures for each of 1984 and 1985; beneath those figures appear totals of $ 151,807 and $ 160,272 for 1984 and 1985, respectively. 7. Criminal Investigation and Michael Sawczak's Guilty Plea
Antoinette and Michael Sawczak *229 were investigated by the Criminal Investigation Division of the Internal Revenue Service for possible violations of Federal tax laws. Antoinette Sawczak was not charged with any such violations. Michael Sawczak entered into an agreement with the U.S. Government before the U.S. District Court, Southern District of Florida. In that agreement, Michael Sawczak agreed to plead guilty to two counts of violating section 7206(1) relating to the 1984 and 1985 taxable years. [5]
8. The Sawczaks' Vehicles
During the years at issue, the Sawczaks purchased two vehicles. In August 1984, Michael Sawczak paid $ 12,581.49 in cash for the purchase of a 1984 Plymouth Voyager. Although titled in the names *230 of Michael and Antoinette Sawczak, this vehicle was driven exclusively by Michael Sawczak. In August 1985, Michael Sawczak purchased a 1985 Mercedes for approximately $ 40,000. Michael Sawczak paid for the 1985 Mercedes with a cashier's check in the amount of $ 20,000 and the trade-in of a 1982 Mercedes. The cashier's check derived from two certificates of deposit owned jointly by Michael and Antoinette Sawczak and issued in January and March 1985, respectively. Like the 1982 Mercedes, the 1985 Mercedes was titled in the names of Michael and Antoinette Sawczak. Antoinette Sawczak drove the 1985 Mercedes once or twice a week. 9. Michael Sawczak's Gifts
During the 1980's, Michael Sawczak made numerous generous gifts to his children, Michael J. Sawczak (Michael), Toni A. Sawczak (Toni), and Susan McCranels (Susan). In December 1983, Michael Sawczak provided Michael with $ 12,575 in cash, for the purchase of a 1984 Plymouth Conquest. Also, while Michael attended junior college, from 1982 through 1986, Michael Sawczak provided Michael with tuition and $ 100 a week for spending money. During 1985 and 1986, he provided Michael with a total of $ 1,200 for orthodontia. Further, *231 during the 1980's, Michael Sawczak gave Toni money or property with a value exceeding $ 33,000: During 1982 and 1983, he provided Toni with $ 10,000 for support, while she attended medical school; during 1987 and 1988, he gave Toni over $ 23,000 in cash and property, largely in connection with her purchase and use of two boats. Michael Sawczak also was generous with Susan and her husband Peter McCranels, providing them with over $ 18,000 in cash during 1985 and 1986, including $ 13,250 to purchase a 1985 Dodge Caravan. OPINION I. Royal Palm Laundromat Adjustments
After trial in this case, in an order dated April 1, 1992, the Court raised questions concerning our jurisdiction over any adjustments flowing from the Royal Palm laundromat, which is operated through Sigma, an S corporation. By a reply filed April 20, 1992, respondent conceded that this Court is without jurisdiction to determine adjustments flowing from Sigma on account of the notice of deficiency's being invalid as it pertains to such corporation. We accept respondent's concession and, accordingly, find it unnecessary to consider the matter further. II. Jog Road Partnership Adjustments
Respondent redetermined *232 petitioners' gross receipts from the partnership as follows: 1983 1984 1985 Actual gross receipts
$ 132,900
$ 154,938
$ 157,369
Reported gross receipts
105,154
103,589
111,852
Unreported gross receipts
27,746
51,349
45,517
Petitioners bear the burden of proving that they did not receive unreporte income from the partnership as determined by respondent. Rule 142(a). That petitioners have failed to do. Respondent's determinations correspond precisely to those appearing on the graphs maintained by Michael Sawczak. As explained below, in our discussion of fraud, we consider the graphs to be extremely credible evidence. As to 1983 and 1984, no credible evidence contradicts the graphs and we sustain respondent's determinations for those years. As to 1985, the only credible evidence contradicting the graphs are the 1985 monthly calendar sheets, suggesting gross receipts in that year of only $ 156,265.92 (as opposed to the $ 157,369 figure suggested by the 1985 graph). We are at a loss to say whether the graph is more credible than the calendar sheets, or vice versa. Petitioners, who have made the tactical choice to argue that neither is accurate, have *233 shed no light on the matter. Thus, the evidence appears to be in equipoise and, because the burden of proof is on petitioners, we sustain respondent's determination in its entirety. III. Fraud
In her notice of deficiency, respondent determined that petitioners were liable for additions to tax for fraud under section 6653(b)(1) and (2) for each year at issue. With respect to the addition to tax under section 6653(b)(1), respondent must demonstrate, by clear and convincing evidence, both (1) that there was some (any) underpayment for each year at issue, and (2) that each such underpayment was due to petitioners' intent to evade taxes known to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). With respect to the addition to tax under section 6653(b)(2), respondent also must demonstrate the amount of the underpayment for each year at issue. Franklin v. Commissioner, T.C. Memo. 1993-184. In all other respects, respondent's burdens under section 6653(b)(1) and (2) are identical. The *234 existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud will never be presumed. Id. Fraud may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Id. Fraud, however, is not imputed from one spouse to another. In the case of a joint return, section 6653(b)(4) provides that section 6653(b) shall not apply with respect to the tax of the spouse unless some part of the underpayment is due to the fraud of such spouse. A. The Underpayment
Respondent has shown that the partnership had unreported gross receipts in the amounts determined for 1983 and 1984, and only slightly less than the amount determined for 1985. As noted above, Michael Sawczak kept two sets of books for the partnership. The first set comprises the ledgers prepared by the partnership's accountant from the bank deposits and bank statements. The second set, of which the firm was unaware, comprises the graph and the 1985 monthly calendar *235 sheets. Because, as discussed below, we find the graph and calendar sheets to accurately reflect the partnership's gross receipts for the years at issue, and because respondent's determinations (as to the partnership income) are based upon those gross receipt figures, we find that the Sawczaks had unreported receipts, on account of unreported partnership receipts, substantially in the amounts determined by respondent. [6] In the absence of any evidence of offsetting credits or deductions, we presume that those unreported receipts give rise to unreported income as determined by respondent. Franklin v. Commissioner, supra.
*236 The evidence strongly demonstrates that the Sawczaks' secret records are correct. [7] As to 1985, that evidence is substantial. First, there are the Sawczaks' numerous representations to potential buyers that the partnership grossed approximately $ 156,000 or $ 157,000 in 1985 or had income of $ 50,000 a year (which is consistent with respondent's determination of roughly $ 42,000, $ 57,000, and $ 61,000 for 1983, 1984, and 1985, respectively). Second, there are the numerous cash register tapes dealing with the partnership, on which a figure of approximately $ 156,000 has been written for some undisclosed reason, the most condemning of which is the undated cash register tape containing the notations "Jog" and "Gross $ 156,265.92". The obvious interpretation of that notation is that the partnership had gross receipts of $ 156,265.92 in some year; inasmuch as the 1985 calendar sheets suggest the same precise figure, and the 1985 graph's figure is substantially consistent, that year almost inescapably would appear to be 1985. Third, the calculations of John Ovaska, the laundromat broker, are far more consistent with the Sawczaks' secret records and respondent's determinations than *237 with the receipts reported by the Sawczaks and the partnership. In fact, Ovaska's calculations, estimating gross receipts of $ 172,000 a year, exceed those determined by respondent and contained in the Sawczaks' secret records. Fourth, a potential purchaser of the laundromats, Arnold Cady, also estimated the partnership's gross receipts and his estimate was substantially consistent with Michael Sawczak's representations and Ovaska's calculations. The evidence also bespeaks the accuracy of the 1983 and 1984 records. Unquestionably, the Sawczaks' secret records accurately reflect the partnership's income in 1985 and 1986, [8] *238 and we feel justified in supposing that the Sawczaks would have been consistent in this regard. [9] Accordingly, the accuracy of the Sawczaks' 1985 and 1996 records bespeaks the accuracy of such records as to 1983 and 1984. Conclusion
As to each year at issue, petitioners have been caught with the proverbial "smoking gun" and have failed to argue credibly that things are not as they appear. Petitioners argue that the secret records were incorrect and, in fact, were deliberately falsified to deceive potential purchasers of the laundromats. That argument is based solely on Antoinette Sawczak's testimony to that effect, which we consider incredible and give no weight. Moreover, the additional evidence in the record strongly supports respondent. Most convincing is that two parties (Ovaska and Cady) with an interest in scrutinizing the gross receipt figures represented by Michael Sawczak (and indicated by the secret records) found such figures to be substantially correct. Respondent has met her burden as to the underpayments for each year at issue (except as qualified as to 1985). B. Fraudulent Intent
1. Michael Sawczak
*239 Respondent has demonstrated, by clear and convincing evidence, that Michael Sawczak intended to evade taxes known to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Michael Sawczak prepared the graphs that we have found to reflect accurately the partnership's gross receipts for the years at issue. He also willfully withheld that information from the accounting firm preparing tax returns for the partnership and the Sawczaks; he further declined to correct the resultant understatements of income, although he had the opportunity to do so for each year at issue, when the firm mailed such returns to the Sawczak home for review. Such actions demonstrate an obvious and blatant attempt to understate income and thereby evade tax. Such a scheme itself, therefore, is sufficient to satisfy respondent's burden of proving fraudulent intent by clear and convincing evidence. See Farber v. Commissioner, 43 T.C. 407, 420 (1965), supplemented by 44 T.C. 4081 (1965) (describing a similar scheme, whereby the taxpayer withheld evidence of receipts from his accountants, as "persuasive evidence *240 of fraud"); cf. Stone v. Commissioner, 56 T.C. 213, 224 (1971) ("Fraud may be inferred from a taxpayer's keeping of a double set of books and handling his records in a manner that would be likely to mislead or conceal."). Moreover, there is considerable additional evidence of Michael Sawczak's intent to conceal income. Michael Sawczak pled guilty to two counts of willful falsification under section 7206(1) respecting 1984 and 1985. Although that conviction does not estop petitioners from denying Michael Sawczak's fraud as to those years, it is evidence of fraud to be considered by the trier of fact. Wright v. Commissioner, 84 T.C. 636, 643-644 (1985). Absent some credible explanation of Michael Sawczak's actions, we think the convictions under section 7206(1), if not dispositive, are highly persuasive. [10] In light of the overwhelming evidence discussed above, we find that respondent has proved, by clear and convincing evidence, for each year at issue, Michael Sawczak's intent to evade taxation. *241 2. Antoinette Sawczak
With respect to petitioner Antoinette Sawczak, we hold that respondent has demonstrated, by clear and convincing evidence, that Antoinette Sawczak intended to evade taxes known to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes, only as to 1985. a. Fraudulent Intent Not Proven as to 1983 and 1984
Antoinette Sawczak would have us believe that she largely was ignorant of financial matters concerning the Jog Road laundromat during each of the years at issue. We do not believe that to be the case. Nevertheless, respondent has not demonstrated, by clear and convincing evidence, see Rule 142(b), Antoinette Sawczak's culpability as to 1983 and 1984. The record demonstrates that Antoinette Sawczak was actively involved in the partnership's operations during each year at issue. As described above, she took particular responsibility for the dropoff business. Moreover, she hired and trained employees and handled payroll, including the calculation of withholding and FICA taxes. She had a 50-percent interest in the partnership and had signatory authority over the partnership bank account. In addition, she *242 performed other tasks, including cleaning the laundromat once a week, helping out at other times, and occasionally helping Michael Sawczak collect the cash from the machines at night. None of this, however, bespeaks a knowledge of the partnership's true income for 1983 and 1984. The only evidence suggesting such knowledge with respect to those years is Antoinette Sawczak's testimony that, on those occasions when she took the weekly receipts to the bank for deposit, she made sure the teller posted the correct amount. Much of the other evidence adduced by respondent pertains only to later tax years. First, the dropoff records in evidence date back only to July 6, 1984, thus having no direct relevance as to 1983 and demonstrating Antoinette Sawczak's knowledge of dropoff receipts only as to a portion of 1984. Second, the monthly calendar sheets, which Antoinette Sawczak helped maintain, pertain only to 1985 and, similarly, have no direct relevance to the earlier years at issue. [11] Third, Antoinette Sawczak's participation in the 1986 meetings with Arnold Cady and respondent has no direct bearing on any year before 1985; her knowledge in 1986 of the partnership's true income before *243 1985, which seems apparent, does not prove such knowledge as to earlier years. Respondent has failed to demonstrate that Antoinette Sawczak knew the partnership's true income for 1983 and 1984. Admittedly, there is good possibility that Antoinette Sawczak, being actively involved in many of the partnership's operations, and having verified certain deposits, knew that the she and Michael Sawczak underreported their income for those years. A "good possibility", however, is insufficient; respondent must adduce clear and convincing evidence of Antoinette Sawczak's fraudulent intent. Rule 142(b). That respondent has failed to do, and we do not sustain her additions to tax for fraud against Antoinette Sawczak as to 1983 and 1984. b. Fraudulent Intent Proven as to 1985
The evidence pertaining *244 only to 1985, combined with the evidence pertaining to each year at issue (discussed directly above) is sufficient to tip the scales in favor of respondent. Beginning no later than July 6, 1984, Antoinette Sawczak maintained records for the dropoff portion of the partnership's business. Those records indicate, and Antoinette Sawczak surely knew, that the dropoff business had gross receipts of roughly $ 48,250 in 1985 and (after taking into account approximately $ 17,500 inserted into the machines to clean the dropoff customers' laundry) net receipts of roughly $ 30,750 in that year. [12] Further, Antoinette Sawczak helped Michael Sawczak maintain the 1985 monthly calendar sheets, sometimes recording thereon the partnership's daily receipts. Therefore, she not only knew the partnership's receipts for those days on which she recorded that information, but would have seen, at a glance, whether the partnership had similar receipts for numerous other days as well. This evidence, together with Antoinette Sawczak's (1) substantial involvement in the partnership's operations, and (2) verifying that certain deposits of the partnership's weekly income were correctly posted to the partnership *245 account, persuades us that she knew of the understatement of income as to 1985. Accordingly, it seems clear that her knowing understatement of income for that year was due to fraudulent intent. We sustain respondent's additions to tax for fraud as to 1985. C. Conclusion
1. Michael Sawczak
Respondent has shown there to be some underpayment of tax for each year at issue. Respondent also has proved Michael Sawczak's fraudulent intent as to each of those years. Accordingly, the additions to tax for fraud imposed by section 6653(b)(1) are sustained in full with respect to Michael Sawczak for each year at issue. With respect to the addition to tax imposed by section 6653(b)(2), however, respondent's burden is greater: *246 She not only must prove some (any) underpayment, but must demonstrate, by clear and convincing evidence, the amount of such underpayment. Accordingly, with respect to Michael Sawczak, we fully sustain the addition to tax under section 6653(b)(2) only for 1983 and 1984, the years for which respondent proved underpayments of tax equal to the entire deficiencies sustained against petitioners. With respect to 1985, however, respondent has proved an underpayment slightly less than that sustained against petitioners. Accordingly, we sustain the addition to tax under section 6653(b)(2) only with respect to that portion. 2. Antoinette Sawczak
Respondent has proved fraudulent intent with respect to Antoinette Sawczak only for 1985. With respect to 1985, we sustain the additions to tax imposed by section 6653(b)(1) and (2) in full and in part, respectively, for the same reasons set forth directly above. IV. Innocent Spouse
In the case of a joint return, the liability of the spouses with respect to the tax generally is joint and several. Sec. 6013(d)(3). Section 6013(e)(1), however, creates an exception to that rule, providing a measure of relief where the taxpayer *247 proves himself to be an "innocent spouse" by satisfying the following four requirements: (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
Petitioner Antoinette Sawczak bears the burden of proving that she is entitled to relief as an innocent spouse under section 6013(e). Rule 142(a). We conclude that petitioner Antoinette Sawczak is not an innocent spouse for any year at issue because she has failed to establish for any such year that she lacked actual knowledge, and had no reason to know, of the understatements of income, as required by section 6013(e)(1)(C). A. Lack of Knowledge Not Proven as to 1983 or 1984
Notwithstanding respondent's failure to prove, by clear *248 and convincing evidence, that Antoinette Sawczak knew the partnership's true income for 1983 and 1984 (and therefore intentionally, rather than inadvertently, underreported income), Antoinette Sawczak has failed to demonstrate, by a preponderance of the evidence, that she lacked such knowledge and had no reason to know of the understatement. Compare Rule 142(b) with (a). As described above, Antoinette Sawczak was active in the operation of the partnership during each year at issue. Her responsibilities throughout that period included hiring and training employees, handling payroll (including the calculation of FICA and withholding taxes), and occasionally making deposits (on which occasions she verified that the correct amount was posted to the partnership account). Further, she had a 50-percent interest in the partnership and had signatory authority over the partnership account. Last, the Sawczaks' automobile purchases and gifts throughout the 1980's, including the years at issue, bespeak a standard of living higher than that suggested by the Sawczaks' reported income for those years, thereby undercutting Antoinette Sawczak's contention that she lacked actual knowledge of the *249 understatements in 1983 and 1984. Based on the foregoing, we think it more likely than not that Antoinette Sawczak had actual knowledge (or at least reason to know) of the partnership's true income in 1983 or 1984. Her testimony to the contrary does not persuade us to the contrary, because -- in part due to our above conclusion that she is culpable of fraud as to 1985 -- we find her testimony to lack credibility. Accordingly, we hold that petitioner Antoinette Sawczak is not entitled to relief as an innocent spouse, under section 6013(e). [13]
*250 B. Lack of Knowledge Not Proven as to 1985
Respondent has demonstrated, by clear and convincing evidence, that Antoinette Sawczak had actual knowledge of the understatement of income in 1985. It necessarily follows, therefore, that she has failed to demonstrate, by even a preponderance of the evidence, that she lacked such knowledge, as required by section 6013(e)(1)(C). Accordingly, we hold that petitioner Antoinette Sawczak is not entitled to relief as an innocent spouse, under section 6013(e). V. Statute of Limitations
Petitioners argue that the period of limitations imposed by section 6501 bars the assessment and collection of the deficiencies and additions to tax at issue. Section 6501(a) provides, generally, for a 3-year period of limitations. Section 6501(c)(1), however, creates an exception to the general rule, extending the period of limitations indefinitely in the case of a fraudulent return. "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." Sec. 6501(c). Obviously, respondent may assess for each year with respect to Michael Sawczak, whom we have found culpable of fraud for each year *251 at issue. Id. Moreover, respondent also may assess for each year with respect to Antoinette Sawczak. section 6501(c)(1) speaks of "a false or fraudulent return" * * *. Thus, even if the joint-filing husband is the only one who committed fraud in filing the return * * * the bar of the statute of limitations still is removed from the deficiencies determined against the wife, and she is liable for the additions to tax by virtue of the joint and several liability provisions of section 6013(d)(3). [Vannaman v. Commissioner, 54 T.C. 1011, 1018 (1970)].
Accord Benjamin v. Commissioner, 66 T.C. 1084, 1100 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). Thus, we reject petitioners' argument and hold that the period of limitations imposed by section 6501(a) does not preclude respondent from assessing the deficiencies and additions to tax otherwise sustained herein. Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. For the sake of convenience, we will sometimes refer to the laundromat operated through the Jog Road Partnership (the partnership) as the Jog Road laundromat.↩
2. Petitioner Antoinette Sawczak neither met with anyone from the firm nor provided the firm with any information relating to the preparation of either petitioners' or the partnership's returns.↩
3. Those 52 figures are substantially similar to the partnership's bank deposits made during 1985.↩
4. The figure of $ 111,852.44 (rounded down to $ 111,852) is the same figure reported as gross receipts on the partnership's 1985 return.↩
5. Sec. 7206(1)↩ provides that any person who "Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" is guilty of a felony.
6. As discussed above, the 1985 calendar sheets indicate gross receipts of $ 156,265.92, and the 1985 graphs differ slightly, indicating gross receipts of $ 157,369. Inasmuch as the burden of proof is on respondent (by clear and convincing evidence) and we consider the graphs and calendar sheets to be equally credible, we are unable to conclude that the partnership had gross receipts exceeding the lesser figure. Franklin v. Commissioner, T.C. Memo. 1993-184; Rule 142(a) and (b)↩. Thus, we find, for purposes of fraud, that the partnership had gross receipts of $ 156,265.92 in 1985.
7. We emphasize that the 1985 monthly calendar sheets' total is substantially similar to that indicated by the 1985 graphs.↩
8. The accuracy of the 1985 records is, of course, demonstrated above. As to 1986, the accuracy of the Sawczaks' monthly records is equally obvious. Clearly, the 1986 figures provided to Jaclyn Tedamonson were based upon the December receipts added to the year's running total ($ 148,911.74) appearing on the November 1986 calendar sheet. Accordingly, it is apparent that, unless Michael Sawczak willingly chose to overstate↩ the partnership's 1986 income, the figures provided to Jaclyn Tedamonson (and the calendar sheets on which such figures were based) are indeed accurate.
9. Conversely, if the 1985 and 1986 secret records overstated↩ the partnership's gross receipts, we could properly draw the inference that records for other years did likewise.
10. Further, Michael Sawczak's negotiations to sell the laundromats, wherein he repeatedly solicited payments "under the table", so as to evade taxation by understating the selling price, would make us particularly skeptical of any otherwise believable explanation petitioners might offer. In any event, petitioners have offered no explanation for Michael Sawczak's actions that we might find believable under any circumstance.↩
11. The graphs maintained by Michael Sawczak do, of course, pertain to each year at issue, but respondent has failed to demonstrate, and we cannot assume, that Antoinette Sawczak assisted with or knew of those graphs.↩
12. This itself makes us highly skeptical that Antoinette Sawczak would have believed the partnership's total↩ ordinary income (from (i) the coin-operated washers and dryers, (ii) dropoffs, and (iii) the game machines) for 1985 to be only $ 15,972, as reported on the Sawczaks' joint return.
13. Furthermore, our finding of fraud, by clear and convincing evidence, with respect to 1985 places Antoinette Sawczak in a particularly difficult position. Given that finding, the most she might achieve would be to persuade us that she remained ignorant of the partnership's true earnings in 1983 and 1984, only to learn more in 1985. Antoinette Sawczak has not attempted to make that argument, however, having made the tactical choice to deny such knowledge for each year at issue. Nor can we draw such conclusion on our own from the evidence. The evidence, while surely more damning as to 1985, does not prove Antoinette Sawczak's ignorance in the preceding years.↩